In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-3814

RICHARD SHARIF,

*Plaintiff-Appellant,*

v.

INTERNATIONAL DEVELOPMENT GROUP CO., LTD.,
MOHAMMED BIN NAIF BIN ABDUL AL AZIZ AL SAUD,
FAISAL AL FARAJ, and SALAH AL BASSAM,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 5430—**George W. Lindberg**, *Judge.*

ARGUED APRIL 12, 2004—DECIDED FEBRUARY 22, 2005

Before WOOD, EVANS, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* A deal too good to be true is generally just that, as Richard Sharif learned to his regret. Sharif brought a number of claims against the International Development Group Co., Ltd. (Development), Prince Mohammed bin Naif bin Abdul Al Aziz Al Saud, Faisal Al Faraj, and Salah Al Bassam arising from Development's alleged failure to fulfill its contractual obligations to Sharif's corporation, R. J. American International Consultants, Ltd. (Consultants). Essentially, Consultants promised to help Development find an American company

to participate in certain hospital management contracts with the Saudi Ministry of Health, for an agreed fee. Much later, Development informed Sharif that it intended to use its relationship with the American companies only to obtain the government contracts, at which point it planned to abandon them in favor of cheaper Pakistani companies. Development nonetheless assured Sharif that Consultants would receive its payments; unsurprisingly, Consultants never saw the money it expected. Eight years after Consultants dissolved, Sharif filed suit in his own name against the defendants. The district court granted summary judgment for the defendants on the ground that Sharif's claims were barred by the five-year period provided by the Illinois corporate survival statute, 805 ILCS 5/12.80. We affirm.

# I

We summarize the facts in the light most favorable to Sharif, as required on our *de novo* review from an adverse decision on a summary judgment motion. *Metzger v. DaRosa*, 367 F.3d 699, 701 (7th Cir. 2004). In the spring of 1988, Al Faraj contacted his old friend Sharif with a business proposal. Al Faraj was president of Development, a Saudi Arabian corporation owned by Prince Mohammed, Al Bassam, and Al Faraj. Al Faraj explained that Development wanted to obtain contracts from the Saudi government to manage hospitals. The rub was that in order to qualify for these bids, Development needed to ally itself with an American or European company with experience in the field. Al Faraj asked Sharif, an American citizen, to locate such a company. In June 1988, Sharif procured Basic American Medical, Inc. (BAMI) of Indianapolis, Indiana. At that point, Sharif and Development reduced their agreement to a written contract, dated June 10, 1988, but only after Development insisted that

Sharif form a corporation, Consultants, to serve as the partner to the deal. The contract between Development and Consultants included this language:

> The Client [Development] agrees to pay R. J. American International Consultants, Ltd. a consultant's fee for the services rendered, pursuant to this Agreement, as follows:
>
> 1% of the gross revenues received by Client of the first contract with any individual American company. However, such percentage is liable for alteration by mutual agreement and according to size of contract entered into presently or in the future, by and between the Client and American companies located within the U.S.A.

Sharif signed the contract on behalf of Consultants.

On October 4, 1988, BAMI and Development signed a written "Collaboration Agreement," with the stated purpose of "establish[ing] a long term collaboration for the purpose of bidding, from time to time, on contracts to operate and manage hospitals in Saudi Arabia and for performing such contracts for which such bids are accepted." Shortly after the parties signed the Agreement, Al Faraj informed Sharif that Development had no intention of using BAMI to manage the hospitals. Rather, Development meant to use its connection with BAMI only to secure the government contracts, which would then be serviced by cheaper Pakistani companies. Sharif asserts that he did not believe Al Faraj's statement at the time and that Al Faraj assured him that Consultants would receive its fee under the consulting agreement. BAMI knew nothing about the planned deception.

As time went on, problems developed. The Iraqi invasion of Kuwait in August 1990 delayed implementation of the deal and held up Development's payments to Con-

sultants. According to Sharif, Al Faraj repeatedly asked him "as a good Muslim" to accept deferred payment, and Sharif repeatedly agreed to wait. The plan further unraveled when, in February 1990, BAMI began to lose its patience, as reflected in a letter it sent to Al Faraj stating: "[W]e have concern in regard to various developments in the granting of the contract for Al Nour and Hera Hospitals . . . to [Development] by the S.A. Ministry of Health. . . . Since you have not signed the final Contract, BAMI cannot commit to do anything until we have reviewed the Contract and have agreed to BAMI's undertaking based upon the final contract." More than a year later, on September 4, 1991, BAMI gave up. It communicated this decision in a letter to the Saudi Ministry of Health that said, in part: "Because of the failure of [Development] to include BAMI in the hospital management transactions as contemplated under the terms of the Collaboration Agreement, BAMI hereby withdraws its support (direct or indirect) to any [Development] project referred to or contemplated by the Collaboration Agreement." The record suggests that Sharif received copies of one or both of these letters at the time they were sent.

On August 1, 1992, Al Bassam sent a letter to Consultants with the following message: "[P]ayment to you . . . regarding 1% consultant fees, in the amount of $800,000 has been approved by HRH Mohammad bin Naif Al Aziz and Mr. Faisal Al Faraj and will be paid to you when we meet in London. We shall confirm that date at a later time." According to Sharif, the meeting in London never took place and Consultants was never paid any amount under the contract or the August 1992 letter, despite Sharif's repeated requests for compensation. For reasons we do not know, Sharif nonetheless refrained from filing suit against the defendants until July 31, 2002, ten years after his receipt of the August 1992 letter and eight years after Consultants was involuntarily dissolved on October 1,

1994. Invoking the diversity jurisdiction of the federal courts, Sharif is now trying to bring claims based on breach of contract; inducing, encouraging, and causing the breach of contract; common law fraud; conspiracy; and various RICO violations. On September 25, 2003, the district court denied Sharif's motion for partial summary judgment and granted the defendants' motion for summary judgment on the ground that Sharif's claims were barred by the Illinois corporate survival statute. This appeal followed.

## II

The Illinois corporate survival statute, 805 ILCS 5/12.80, stands at the heart of this appeal. It says, in pertinent part, "[t]he dissolution of a corporation . . . shall not take away nor impair any civil remedy available to or against such corporation, its directors, or shareholders, for any right or claim existing, or any liability incurred, prior to such dissolution if action or other proceeding thereon is commenced within five years after the date of such dissolution." We have clarified that "[u]nder Illinois law the five-year period after dissolution marks the outer limit for suits *by* dissolved firms as well as suits against them." *Citizens Elec. Corp. v. Bituminous Fire & Marine Ins. Co.*, 68 F.3d 1016, 1018 (7th Cir. 1995). As there is no dispute that Sharif filed suit eight years after Consultants was dissolved, well outside the five-year period provided by the Illinois survival statute, we must first determine whether the statute applies here.

In *Canadian Ace Brewing Co. v. Joseph Schlitz Brewing Co.*, 629 F.2d 1183 (7th Cir. 1980), we explained that the statute's "intended purpose is to continue the life of a corporation for [five] years for the purpose of settling its affairs and that actions to collect claims due the corporation may be begun at any time within [five] years

after dissolution of the corporation. After this [five]-year period, the corporation can neither sue nor be sued," *id.* at 1185. Furthermore, as a statute of repose, it is "applicable not only to a dissolved corporation but also to its directors and shareholders." *Id.* at 1186. If that were all, it would be clear that Sharif's suit indeed comes too late. But it is not: the Illinois courts have carved out two exceptions to this rule which allow former shareholders of dissolved corporations to file suit outside the five-year period, and to those exceptions we now turn.

The first exception stems from the distinction between shareholders' derivative actions and their individual claims. In *Hunter v. Old Ben Coal Co.*, 844 F.2d 428 (7th Cir. 1988), we noted that "[u]nder Illinois law, a shareholder's claim is a derivative claim, not an individual claim, if the alleged injury only affects the shareholder indirectly in his or her capacity as a shareholder." *Id.* at 431-32. On the other hand, "where the wrongful acts are not only against the corporation but are also violations of a duty arising from a contract or otherwise, and owed directly by the wrongdoer to the stockholders," the shareholders can state a direct claim. *Id.* at 432. As only derivative claims are limited by the five-year survival period, *id.* at 434-35, the correct characterization of a shareholder's claim determines whether she can recover, see *id.* at 435. Illinois law instructs that "[t]o be a 'direct' beneficiary and therefore the third party beneficiary of a contract, the parties to the agreement must 'have manifested in their contract an intention to confer a benefit upon the third party.'" *Id.* at 432 (quoting *Altevogt v. Brinkoetter*, 421 N.E.2d 182, 187 (Ill. 1981)). As nothing in the Consultants-Development contract suggests that Sharif was a third-party beneficiary, rather than an indirect beneficiary through his sole ownership of Consultants, his claims do not come within this exception to the Illinois survival statute.

We turn, then, to the second exception to the Illinois survival statute, which arises from "the rights of former shareholders to succeed, in their individual capacities, to rights owned by their corporation prior to its dissolution." *Canadian Ace*, 629 F.2d at 1186. In *Canadian Ace*, we "recognize[d] the general principle that property of a dissolved corporation passes to its stockholders, who can then maintain an action on the property." *Id.* at 1187. At the same time, this right is not unlimited. It turns on the "distinction between the transfer of a corporate claim reduced to a judgment and a never asserted corporate claim." *Id.* Only the former "represents a debt, fixed in amount, and is evidenced by a document." The analogy is between the transfer of a corporate claim and "a transfer of tangible property on which an action can be maintained." *Id.* On this basis, we held that the Illinois survival statute bars, after five years, "any actions on inchoate claims." *Id.* at 1188.

Even this rule is not absolute, however. Subsequent Illinois cases have "rejected the argument that an inchoate claim is automatically barred by the corporate survival statute." *Dubey v. Abam Bldg. Corp.*, 639 N.E.2d 215, 219 (Ill. App. Ct. 1994). In *Shute v. Chambers*, 492 N.E.2d 528 (Ill. App. Ct. 1986), former shareholders of a dissolved corporation sued to recover under a purchase agreement and promissory note for $85,000, which were executed by defendant Chambers in favor of their corporation, *id.* at 529. Relying on *Canadian Ace*, Chambers argued that "since there is no judgment in this case, the claim is inchoate and barred by" the survival statute. *Id.* at 531. The court rejected this argument on the ground that "[t]he purchase agreement and note represented a debt of which the fixed amount could be ascertained" and "that asset became the individual property of the shareholders upon the corporation's dissolution." *Id.* at 531-32. "The present action," the court explained, "is not a suit by or against

a dissolved corporation, but rather is a debt incurred by defendant as evidenced by the purchase agreement and installment note." *Id.* at 532. Therefore, the survival statute did not apply.

Relying on this reasoning, the Illinois courts have found the survival statute inapplicable where shareholders of a dissolved corporation sued to enforce rights resulting from an installment note and assignment of rents that named their corporation as payee. See *Lake County Trust Co. v. Two Bar B, Inc.*, 537 N.E.2d 1015, 1021 (Ill. App. Ct. 1989). Likewise, in *Dubey*, the Illinois appellate court found that the survival statute did not bar a suit by the shareholder of a dissolved corporation who sought to recover a $2,400 security deposit after the corporation's landlord prematurely terminated its lease. 639 N.E.2d at 217. While the court rejected the plaintiff's suggestion that "any cause of action may be considered a corporate asset," it explained that "[i]n this case, . . . plaintiff does not claim that his cause of action is *in itself* a corporate assert." *Id.* at 219. "Rather, plaintiff has brought a cause of action to recover a security deposit under a lease, which is generally considered to be a corporate asset to which former shareholders may succeed by operation of law following dissolution of the corporation. Thus, this case falls outside the scope of *Canadian Ace Brewing Co.* and within the scope of *Shute*." *Id.*

As these cases illustrate, Illinois courts do not apply the corporate survival statute to bar claims arising from "a debt of which the fixed amount could be ascertained." *Shute*, 492 N.E.2d at 531-32. But that exception does not apply here. Sharif has presented only a traditional breach of contract claim. Prior to its dissolution, whatever claim Consultants may have had against Development was never reduced to judgment. Nor did the Consultants-Development contract specify any set amount owed to

Consultants. Instead, it simply said that Consultants would receive "1% of the gross revenues received by Client [Development] of the first contract with any individual American company." Sharif's damages, which he asserts total at least $742 million plus interest, are only that: his assertions. Thus, Sharif's contract claims are not based on "a debt of which the fixed amount could be ascertained." *Shute*, 492 N.E.2d at 531-32. To permit Sharif to sue Development for breaching its contract with Consultants eight years after Consultants dissolved would effectively nullify the Illinois corporate survival statute and "would interfere with its purpose of requiring the prompt and orderly winding up and finalization of corporate affairs." *Davis v. St. Paul Fire & Marine Ins. Co.*, 727 F. Supp. 549, 553 (D.S.D. 1989); see also *Canadian Ace*, 629 F.2d at 1185.

Sharif's last hope for recovery rests on the August 1, 1992, letter from Al Bassam to Consultants, which states: "[P]ayment to you up to that time regarding 1% consultant fees, in the amount of $800,000 has been approved by HRH Mohammad bin Naif Al Aziz and Mr. Faisal Al Faraj and will be paid to you when we meet in London. We shall confirm that date at a later time." The defendants contest the authenticity of this letter, but on summary judgment, we treat it as valid. Unlike the contract between Consultants and Development, this letter identifies a specific amount that Development owed to Consultants and thus cannot be rejected out-of-hand on the ground that it does not provide a "fixed and ascertainable sum." Although Sharif never describes it as such, the August 1992 letter might be a promissory note. In *Shute* and *Two Bar B*, *supra*, the Illinois courts held that the survival statute does not apply to shareholders' actions to enforce promissory notes executed in favor of their now-dissolved corporations, because a note is an "asset [that becomes] the individual property of the shareholders upon the corporation's dissolution." *Shute*, 492 N.E.2d at 532.

This theory cannot help Sharif, however, because he has forfeited any argument that he is suing to enforce a promissory note. It is clear from Sharif's complaint and his subsequent filings that he is not suing on the August 1992 letter as a promissory note, but rather is bringing a breach of contract action on behalf of Consultants. Sharif's complaint states: "This action stems from a breach of contract, and RICO violations and common law fraud relating thereto. The said contract was between [Consultants], an Illinois corporation, and defendant [Development]." The complaint also says: "Plaintiff brings this action in his own name for any causes of action [*Consultants*] *may have had* stemming from the facts and matters alleged in this Complaint because [Consultants] has been dissolved and under the law of the State of Illinois, specifically 805 ILCS 5/12.30, all of [Consultants's] assets, including its causes of action, became the assets of the plaintiff upon the said dissolution because the plaintiff was [Consultants's] sole stockholder" (emphasis added). On appeal, Sharif again frames the dispute as one arising from Development's breach of its contract with Consultants and asserts that "bringing the case at bar on that property [the Consultants-Development contract] was done in the plaintiff's *individual* capacity, not derivatively." As evidence that Development breached its contractual duty to compensate Consultants for its services, Sharif points to the August 1992 letter which, he argues, "is central" because it "confirms that he is owed $800,000 under the Consulting Services Agreement" with Development. This position is consistent with his complaint, which characterizes the August 1992 letter as "a renewal of the [Consultants-Development] contract" that "formalize[s] the continued contractual relationship of the parties," rather than as a promissory note providing a basis for recovery distinct from the underlying breach of contract claim.

We conclude that Sharif has brought a breach of contract action, an inchoate claim, rather than an independent action to enforce a promissory note. In *Dubey*, the Illinois appellate court found the corporate survival statute inapplicable because "plaintiff does not claim that his cause of action is *in itself* a corporate asset." 639 N.E.2d at 219. Rather, the shareholder's cause of action provided a means to recover on the underlying corporate asset— in that case, a security deposit under a lease. *Id.* By contrast, Sharif argues that "the contract between the plaintiff's company and [Development] obviously constitutes 'property on which an action can be maintained.'" Thus, as Sharif frames it, the corporate asset that provides the basis of his claim is Consultants's breach of contract action, *not* the August 1992 letter and the promise of $800,000 contained therein. Sharif's calculation of the damages he owed on his motion for partial summary judgment is consistent with this understanding of his underlying claim: Sharif does not seek to recover the $800,000 specified in the August 1992 letter; rather, he uses this sum only to calculate the full amount owed to Consultants over the duration of the contract, totaling (conservatively, by his account) $12.38 million.

Even if Sharif had not forfeited the promissory note argument, there is a serious question whether his claim could go forward, because the August 1992 letter does not appear to meet the definition of a promissory note under Illinois law. The Illinois Supreme Court has defined a promissory note as "a written promise by one person to pay another person therein named, or order, a fixed sum of money at all events and at a time specified therein or at a time which must certainly arrive." *Lanum v. Harrington*, 107 N.E. 826, 828 (Ill. 1915); see also *Meridian Software Funding, Inc. v. Pansophic Sys., Inc.*, No. 91 C 6055, 1992 WL 107310, at *2 (N.D. Ill. May 14, 1992). While the August 1992 letter promises Sharif that $800,000 "will be paid to you when we meet in London," it equivocates by

saying that "[w]e shall confirm that date at a later time." This uncertainty may mean that the letter is not, after all, a promissory note, as Illinois law specifies that "[n]o contract or agreement constitutes a promissory note which does not provide for payment absolutely and unconditionally. If payment depends upon a contingency that may never happen, it is not a promissory note." *Lanum*, 107 N.E. at 828. Indeed, the promised meeting in London proved to be just such a contingency: there is no evidence in the record that the parties ever set a date for this meeting or that the meeting in fact occurred.

Sharif did not sue to enforce a "fixed or ascertainable" debt, but rather stated a number of open-ended claims that belonged at one time to Consultants. His action is thus a derivative one subject to the five-year survival period found in the Illinois corporate survival statute. As it is undisputed that Sharif delayed filing suit until eight years after Consultants was dissolved, his claims were properly dismissed.

## III

For these reasons, we AFFIRM the judgment of the district court.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*