**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name:    14a0332n.06

**Nos. 12-5592/12-5594/12-5595**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 28, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PHILIP E. BOYNTON et al., | ) | |
| | ) | |
| Plaintiffs-Appellees/Cross Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| HEADWATERS, INC., | ) | |
| | ) | |
| Defendant-Appellant/Cross-Appellee. | ) | |
| | ) | |

Before:   DAUGHTREY, ROGERS, and McKEAGUE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.   More than 13 years after first invoking diversity jurisdiction in federal court, the plaintiffs, former shareholders of Adtech, Inc., a now-dissolved Illinois corporation, and the defendant, Headwaters, Inc., ask us to resolve issues presented in the parties' appeals and cross-appeals.   Despite the long-running history of their disputes, the positions of the parties set forth in their myriad allegations of error can be summarized neatly:   the plaintiffs believe they deserve to receive more money from the defendant than the district court ordered; the defendant believes it should not be required to disgorge any of its assets to any individual or group, especially to the plaintiffs.   For the reasons set out in this opinion, we conclude that the district court did not commit reversible error in its latest dispositive rulings.   We thus affirm the judgment entered below.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Having lived with this case for many years, the district judge had the opportunity on multiple occasions to recount the facts relevant to these appeals.   In one such instance, he ably summarized:

> This case arises from James Gary Davidson's ("Davidson") scheme to defraud investors in an Illinois corporation called Adtech ("Adtech I").   Davidson invented a coal agglomeration process that was patented ("'629 Patent") in 1993.   Davidson told Adtech I's investors that he had assigned his interest in the '629 Patent to the company, but Davidson knew that Adtech I had been administratively dissolved in 1991 by the Illinois Secretary of State.   Accordingly, Davidson's purported assignment was ineffective.
>
> Undeterred by Adtech I's administrative dissolution, Davidson continued to operate the company as if it still existed.   Adtech I's post-dissolution transactions include (1) the grant of a license in the '629 Patent ("Carbontec License") to Carbontec Energy Corporation in 1996 and (2) the receipt of royalties from the Carbontec License.
>
> Davidson began discussions with Headwaters in 1998 regarding the transfer of Davidson's rights in the '629 Patent and related technologies to Headwaters. Davidson told Headwaters in the course of negotiations that Adtech I no longer existed.   On May 14, 1998, a second Adtech corporation ("Adtech II") was formed.   Adtech II had one shareholder, Macrotech Corporation ("Macrotech"), which Davidson controlled.   On October 21, 1998, Adtech II transferred its putative rights in the '629 Patent to Davidson.   Shortly thereafter, Davidson executed purchase agreements with Headwaters in which Davidson transferred his rights in the '629 Patent and the Carbontec License to Headwaters.   Headwaters' then-counsel prepared these purchase agreements.   Headwaters issued 60,000 shares of common stock to Adtech II and Macrotech in exchange for the '629 Patent and Carbontec License.
>
> Davidson did not disclose the existence of the purchase agreements to Adtech I's investors until May 25, 1999.   Davidson then told Adtech I's investors about the administrative dissolution in a letter of resignation dated November 23, 1999.

In August 2000, three of the named plaintiffs filed suit against Davidson and Headwaters in federal district court, alleging that the sale of the '629 Patent to Headwaters was illegal because it

was consummated without proper corporate authorization. The district court dismissed the matter in its entirety, however, concluding that, because Adtech I never owned the contested patent, the corporation and its shareholders lacked standing to assert any ownership rights to it.

The plaintiffs then filed the present lawsuit in 2002 *in their individual capacities* against Davidson, Headwaters, and Grayton Hoover, Adtech's accountant. Included in that complaint was a federal claim for patent infringement, as well as state-law claims for fraud and civil conspiracy, breach of constructive trust, breach of fiduciary duty for a resulting trust, conversion, breach of contract, and interference with contract. When Hoover filed for bankruptcy protection, the plaintiffs dismissed him from the suit. They also entered into a court-approved settlement agreement with Davidson, leaving only Headwaters as a party defendant. In 2005, the district court granted Headwaters's motion for summary judgment and dismissed the action in its entirety. The Federal Circuit agreed that the plaintiffs could not succeed on their claim of patent infringement but reversed the district court, in part, by reinstating the plaintiffs' state-law civil-conspiracy claims against the defendant. *Boynton v. Headwaters, Inc.*, 243 F. App'x 610 (Fed. Cir. 2007).

In preparation for trial, the plaintiffs moved for class certification under Rules 23 and 23.2 of the Federal Rules of Civil Procedure. The district court granted the Rule 23 motion, defining the class as "[a]ll shareholders of the First Adtech, their heirs, successors, and assigns, who did not receive dividends through the Second Adtech." However, the district court refused to grant the plaintiffs' request to be certified as an unincorporated association under Rule 23.2 of the Federal

Rules of Civil Procedure because the plaintiffs could not demonstrate "voluntary and knowing membership" in the group, the "hallmark of an unincorporated association" under Tennessee law. Headwaters sought permission from both the Sixth Circuit and Federal Circuit to appeal the class-certification determination. The Federal Circuit dismissed the appeal for lack of jurisdiction under 28 U.S.C. § 1292(c). *Boynton v. Headwaters, Inc.,* 321 F. App'x 943, 944 (Fed. Cir. 2008). We also denied Headwaters the right to appeal, recognizing the broad discretion of the district court to grant class certification.

Two additional complications arose in advance of trial. First, because the district judge considered the plaintiffs' reference to a "constructive trust" to be a separate claim – not a remedy – the court determined that the plaintiffs' case against Headwaters sounded in both law (the civil-conspiracy claim) and equity (the constructive-trust "claim"). Only the former conferred upon the plaintiffs a right to a jury trial. Faced with that dichotomous situation, the district court decided to allow a jury to resolve the legal question but issue only an "advisory verdict" on the "Plaintiffs' constructive trust claims."

Second, discovery disputes necessitated treating the named and unnamed members of the plaintiff class differently. Headwaters wished to serve discovery requests on all members of the purported class, whereas the plaintiffs wished to shield unnamed class members from intrusive discovery. Partially out of concern for the burden that otherwise would be placed upon the unnamed plaintiffs, the district judge ordered a bifurcated trial. The first phase, to be conducted in the summer of 2009, would decide "issues common to the entire class" as well as "any individual

issues of the named Plaintiffs."    The district court left to itself the discretion to determine, after the conclusion of first trial, "whether there are any remaining issues related to the unnamed class members which will require individualized proof in a second phase of trial."    Only then, at that second stage in the proceedings, would Headwaters be allowed to "conduct appropriate discovery" against unnamed plaintiffs.

At the first trial in June 2009, the plaintiffs presented evidence that they believed established three forms of fraud perpetrated by the defendant:    fraudulent misrepresentation, promissory fraud, and fraudulent concealment or omission.    After jury deliberations began, however, the jury sent a question to the district judge asking whether the jury was required "to agree on the method of fraud or can each juror possibly agree to a separate method of fraud?"    The district judge responded with a supplemental jury instruction:    "[I]t is not necessary that you all agree that the fraud was committed by the same method."    As a result, following its deliberations, the jury determined that Davidson, or someone acting in concert with him, "made either (1) a fraudulent misrepresentation . . . OR (2) a fraudulent omission/concealment . . . with respect to" eight of the nine named plaintiffs.    The ninth plaintiff was Philip Boynton, who the jury found had failed to demonstrate a sufficient ownership interest in Adtech I.

The jury also concluded from the trial testimony that the named plaintiffs had an ownership interest in Adtech I prior to the corporation's 1991 administrative dissolution, that the plaintiffs could not have uncovered the 1998 transactions between Davidson and Headwaters "in the exercise of reasonable care or diligence," and that "Headwaters engaged in a civil conspiracy to

5

defraud the Plaintiffs by depriving them of the profits from the '629 patent in 1998." Nevertheless, the jury determined that the plaintiffs failed to prove by clear and convincing evidence that Headwaters's conduct was "reckless, intentional, fraudulent, or malicious." Finally, the jury provided the district court with a finding that the plaintiff class had suffered $21,425,000 in damages as a result of Headwaters's improper actions, a finding that the district court recognized as advisory only, given that the plaintiffs were seeking equitable, not legal, relief.

Following that trial, the district judge determined that certain issues affecting the unnamed class members remained unresolved, thus necessitating a second trial. Headwaters was permitted to conduct additional discovery of the unnamed plaintiffs, leading the defendant to file numerous motions, most of which were denied. However, the district court did grant Headwaters's motions to dismiss the claims of plaintiffs who were heirs of deceased Adtech shareholders (because those plaintiffs could not prove that the decedents had acted reasonably in relying upon Davidson's statements) and the claims of plaintiffs who had declared bankruptcy (because any Adtech stock previously owned by those individuals was now owned by their bankruptcy estates).

The second jury trial was conducted in late summer 2010. Based upon the evidence presented, the jury made the following factual findings: the unnamed class members had an ownership interest in Adtech prior to 1991; the unnamed class members had relied on Davidson's misrepresentation or concealment/omission of facts; the reliance by most, but not all, of the unnamed plaintiffs on Davidson's representations was reasonable; the plaintiffs could not have uncovered the existence of the 1998 transactions between Davidson and Headwaters through the

exercise of reasonable care; and the unnamed plaintiffs suffered damages as a result of Davidson's fraudulent concealment or misrepresentation.

Based upon the jury's verdict, the plaintiffs then requested that the district court place in a constructive trust for their benefit the full dollar value of the royalties received by Headwaters from the Carbontec license (more than $43,000,000), plus prejudgment interest and costs. The district court rejected that request, instead ordering a constructive trust for $16,011,771 with no prejudgment-interest award.

All parties to the dispute sought to appeal various portions of the district court's judgment to the Federal Circuit. That court transferred the appeals to us after determining that it no longer had jurisdiction over the matter. Thus, we now have before us three appeals: (1) an appeal by defendant Headwaters (Case 12-5592); (2) a cross-appeal by the named plaintiffs and those unnamed plaintiffs who were included in the constructive-trust remedy (Case 12-5594); and (3) an appeal by the unnamed plaintiffs who were excluded from the constructive-trust remedy (Case 12-5595).

## II. DISCUSSION

### A.    Appeal by Defendant Headwaters (Case 12-5592)

Headwaters raises three issues for our review. The corporation first asserts that the plaintiffs failed to establish that they suffered any injury as a result of Headwaters's actions; therefore, Headwaters argues, the plaintiffs have no standing to bring a claim for fraud under Tennessee law. Second, Headwaters submits that the applicable provisions of 35 U.S.C. § 262

shield it from liability to the plaintiffs for the sale of the patent by Davidson. Finally, the defendant maintains that a supplemental jury instruction given by the district court violated the requirement that a jury's verdict be unanimous, thus necessitating a new trial. We conclude that no reversible error was committed in regard to any of these three allegations of error.

### 1. Alleged Lack of Injury

Injury is an essential element of fraud. Under Tennessee law, "[a] party seeking to recover damages for fraud and/or misrepresentation must not only establish the misrepresentation but *must also establish some loss or injury as a result of the misrepresentation*." *Harrogate Corp. v. Sys. Sales Corp.*, 915 S.W.2d 812, 817 (Tenn. Ct. App. 1995) (emphasis added). Headwaters argues that no proof exists to show that "each member of the class . . . owned or had some other protectable interest in the '629 Patent and Carbontec License." Consequently, Headwaters asserts that the plaintiffs cannot show the requisite injury to support their claim of conspiracy to commit fraud. Concomitantly, Headwaters claims that, because they cannot show an injury, the plaintiffs lack standing to bring their causes of action. *See Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 523-24 (6th Cir. 2001) ("To satisfy Article III's standing requirements, a plaintiff must show: (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (internal quotation marks and citation omitted).

We review *de novo* the district court's denial of Headwater's post-trial motion for judgment as a matter of law raising these objections. *See H.C. Smith Invs., LLC v. Outboard Marine Co.*, 377 F.3d 645, 650 (6th Cir. 2004). Under Tennessee law – the law applicable to Headwaters's motion filed pursuant to Rule 50(b) of the Federal Rules of Civil Procedure in this diversity action – we must "take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence." *Hometown Folks, LLC v. S & B Wilson, Inc.*, 643 F.3d 520, 526 (6th Cir. 2011) (quoting *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977)). "A verdict should be directed only 'where a reasonable mind could draw but one conclusion.'" *Id.*

Paramount in Headwaters's assertion that the plaintiffs suffered no injury from Davidson's assignment of the '629 Patent is the fact that the Illinois Secretary of State administratively dissolved Adtech in April 1991, some three months *before* Davidson signed papers purporting to assign the rights to his soon-to-be-filed patent to Adtech. Because Adtech's corporate charter had lapsed by the time of the July 1991 transfer of the patent, the assignment failed under Illinois law. *See* 805 Ill. Comp. Stat. 5/12.30(a) ("Dissolution of a corporation terminates its corporate existence and a dissolved corporation shall not thereafter carry on any business except that necessary to wind up and liquidate its business and affairs."). No party to this litigation contends that the patent assignment was necessary to "wind up and liquidate" Adtech's affairs; therefore, that transfer of ownership of the patent was a nullity.

For good reason, the plaintiffs do not contest the defendant′s assertion that, as a result of the company′s earlier dissolution, Adtech did not own the ′629 Patent. Indeed, it is the very dissolution of Adtech without notice to the shareholders that defines the injury that forms the basis for the plaintiffs′ fraud claim. Headwaters′s argument in this regard thus utilizes the proverbial "straw man" and is of no relevance to the strength of the plaintiffs′ claims.

Of similar irrelevance is Headwaters′s argument that the plaintiffs, as shareholders of a corporation, have no legal or equitable title to the property of the corporation. Instead, the defendant contends, the plaintiffs′ interests are only derivative of those of the corporation itself, a corporation that had been dissolved before it could obtain any interest in the patent at issue. However, the force of this argument by Headwaters is undercut fatally by the jury′s verdict that Davidson and Headwaters perpetrated a fraud on the plaintiffs *as individuals*, not upon the plaintiffs in their derivative capacities as corporate shareholders. The plaintiffs thus met the injury requirement of their basic common-law fraud claims against Headwaters. *See NBD Bank, N.A. v. Fulner*, 109 F.3d 299, 301 (6th Cir. 1997) ("A shareholder′s rights are merely derivative unless he can show violation of a duty owed directly to him.").

Headwaters next argues that because the plaintiffs could not establish an equitable injury, the district court erred in imposing a constructive trust for their benefit. The defendant′s objection to the district court′s equitable remedy is actually three-fold: (1) the plaintiffs could not demonstrate an ownership interest in the patent; therefore, they cannot identify an equitable interest that would justify receipt of an equitable remedy; (2) the plaintiffs made no contribution to

the development of the patent; therefore, they are not entitled to benefits generated by the transfer of that technology; and (3) any injury suffered by the plaintiffs was complete in 1996 when the time for reinstating Adtech I as a corporation expired; therefore, the plaintiffs could not have any interest in the technology that Headwaters acquired in 1998.

Headwaters's challenge to the imposition of a constructive trust absent evidence of the plaintiffs' ownership of an interest in the patent itself is misplaced. Under Tennessee law, deprivation of property "by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means," justifies the imposition of a constructive trust. *Livesay v. Keaton*, 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980); *see also Myers v. Myers*, 891 S.W.2d 216, 219 (Tenn. Ct. App. 1994). Because the plaintiffs did allege fraud here, Headwaters cannot use the plaintiffs' lack of property interests in the patent to show a lack of equitable interests.

Nor is there merit to Headwaters's argument that the plaintiffs cannot show an equitable interest in the patent simply because they did not prove "that they made any monetary or other contribution after Adtech's dissolution in 1991," and that their pre-1991 contributions "were lost . . . as a matter of law, when the company was dissolved." By its verdict, the jury concluded that the plaintiffs suffered injuries in their *individual* capacities. Headwaters, perhaps recognizing the daunting task facing a party seeking to overturn a jury verdict, does not challenge this finding directly. Thus, irrespective of the plaintiffs' failure to make financial or other

contributions to the development of the patent through the corporate organization, the fraud perpetrated on the plaintiffs, as individuals, entitled them to the benefits of a constructive trust.

Finally, the jury's verdict also defeats Headwaters's argument that the company cannot be liable for conspiracy because it did not begin negotiations with Davidson until 1998, two years after the dissolution of Adtech I became final.[1]   In submitting the case to the jurors, the district judge instructed that "one cannot join a conspiracy once the conspiracy is complete – that is, when the object of the conspiracy has been achieved."   In finding Headwaters liable for conspiracy, therefore, the jurors necessarily found that the conspiracy continued past 1996.   Headwaters presents no evidence that compels a conclusion that this decision was faulty.   Because Headwaters fails to challenge directly the jury findings that moot the defendant's equitable-injury arguments, we will not disturb those determinations now on appeal.

### 2.   Liability Protection Afforded by the Provisions of 35 U.S.C. § 262

In a second issue, Headwaters argues that the district court erred in failing to find that Headwaters's purchase of the patent from Davidson was protected by the provisions of 35 U.S.C. § 262 – regardless of whether Davidson's conduct was fraudulent – and that the district court's denial of its Rule 50(b) motion on this issue should be reversed.   Again, we review a claim of error in the denial of the defendant's Rule 50(b) motion *de novo*.   *See H.C. Smith Invs.*, 377 F.3d at 650.

---

[1]Pursuant to Ill. Comp. Stat. 5/12.80, Illinois's corporate survival statute, civil remedies available to or against corporations dissolved by the secretary of state may be commenced within five years after the date of dissolution.   Thus because Adtech I was dissolved in 1991, actions by and against the corporation could have been brought as late as 1996.

Pursuant to 35 U.S.C. § 262, "[i]n the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." We have long interpreted this statutory provision to mean that patent "co-owners are at the mercy of each other." *Willingham v. Star Cutter Co.*, 555 F.2d 1340, 1344 (6th Cir. 1977). The power of one co-owner is such that "a co-owner of a patent can even grant a license to a third party without consent of the other owners and neither the co-owner-licensor nor the third-party-licensee is liable to the other owners." *Id.*

Headwaters argues that this statutory provision insulated Davidson's sale of the patent to the defendant from the claims of the plaintiffs. According to Headwaters, 35 U.S.C. § 262's broad grant of rights to joint patent owners does not include an exception for fraudulent conduct by co-owners. Particularly, Headwaters cites *Fina Technology, Inc. v. Ewen*, 857 F. Supp. 1151 (N.D. Tex. 1994), for the proposition that, because 35 U.S.C. § 262 does not include a fraud exception, the plain language of the statute suggests that "[a]n allegation of fraud . . . does not diminish the joint owner's statutory right to sell or license under section 262."

Although Headwaters is correct that Congress did not engraft a fraud exception upon the language of 35 U.S.C. § 262, the provisions of that statutory provision are irrelevant to the case at hand. This case does not concern Headwaters's right to use the technology; rather, Headwaters's liability is based upon claims of civil conspiracy under state, not federal, law. In other words, Davidson's right to sell Headwaters the patent as a co-owner does not affect the plaintiffs' claims to

13

the profits that accrued to Headwaters. The predicate tort at issue here is not the sale of the patent from Davidson to Headwaters; it is the fraudulent misrepresentation or concealment that occurred when Davidson pretended that Adtech I still existed. The predicate fraud, in other words, was separate from the sale of the patent. Nothing in 35 U.S.C. § 262 speaks to that claim.[2] All 35 U.S.C. § 262 protects is Davidson's sale of the patent to Headwaters. However, Headwaters's liability to the plaintiffs in this case does not stem from an allegedly illegitimate patent sale, but rather from its conspiracy with Davidson to defraud the shareholders of Adtech I.

As a result, 35 U.S.C. § 262 can shield Headwaters from state-law tort liability only if that federal statute preempts the state-law claims. But there is good reason to believe that the statute does not preempt state-law claims of civil conspiracy. In *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215 (1st Cir. 2005), for example, the First Circuit held that 35 U.S.C. § 262 did not preempt an unjust-enrichment claim that resulted from behavior that was not governed by patent law. "[I]f the tort action is based on conduct that is not 'protected or governed by federal patent law,' then 'the remedy is not preempted.'" Id. at 234 (quoting Hunter *Douglas, Inc. v. Harmonic Design*, 153 F.3d 1318, 1335 (Fed. Cir. 1998)).

As in *Massachusetts Eye & Ear*, this case involves a tort action arising out of conduct that is not "protected or governed by federal law." Thus, the provisions of 35 U.S.C. § 262 will not

---

[2]By contrast, 35 U.S.C. § 262 may shield a third party who purchases a patent from a fraudulent co-owner from enduring a patent-infringement suit by other patent co-owners. *See, e.g., Talbot v. Quaker-State Oil Ref. Co.*, 104 F.2d 967, 967-68 (3d Cir. 1939) ("[l]icense by one of two joint owners is a complete defense to an infringement suit").

preempt the state-law claim. Headwaters's invocation of 35 U.S.C. § 262 as a defense against liability in this case is unavailing.

### 3. Jury Instruction on the Necessity of Unanimity

In its final issue on appeal, Headwaters insists that the district court committed reversible error when instructing the jury that it need not agree unanimously on the form of predicate fraud perpetrated by Davidson to support the conspiracy charge against Headwaters. "The legal correctness of the [jury] instructions is a question of law that is reviewed de novo." *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 273-74 (6th Cir. 2009). "Reversal of a jury verdict based on incorrect jury instructions is warranted only when the instructions, 'viewed as a whole, [are] confusing, misleading, and prejudicial.' As a result, we will not set aside a jury verdict on the basis of a technically faulty jury instruction when the error is harmless." *Id.* at 274 (quoting *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 641 (6th Cir. 2005)).

Tennessee law defines a civil conspiracy "as a 'combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means.'" *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn. 2001) (quoting *Dale v. Thomas H. Temple Co.*, 208 S.W.2d 344, 353 (Tenn. 1948)). "[A] conspiracy to defraud means a 'common purpose, supported by a concerted action to defraud, that each [conspirator] has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has that purpose.'" *Id.* (quoting *Dale*, 208 S.W.2d at 353–54) (second alteration in original). Significantly, "[c]ivil conspiracy requires an underlying predicate tort allegedly committed

pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007) (citations omitted).

The jury instructions initially offered by the district judge outlined the elements of the three types of fraud recognized under Tennessee law: fraudulent misrepresentation, promissory fraud, and fraudulent concealment. Although all are related offenses, the elements of each differ slightly. For example, fraudulent misrepresentation requires, among other elements, the intentional *misrepresentation* of a material "existing or past fact" with the intent to defraud. *See, e.g.*, *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008). Fraudulent concealment requires both the *concealment* of a material fact for which there is a duty to disclose and an intent to mislead. *See, e.g., Shadrick v. Coker*, 963 S.W.2d 726, 735-36 (Tenn. 1998). Distinct from the other two forms of fraudulent activity, promissory fraud involves a misrepresentation embodying "a promise of *future* action without the present intention to carry out the promise." *Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (emphasis added).

Given those distinctions, during their deliberations, the jurors sent an inquiry to the district judge, asking whether it was necessary to agree on one specific form of predicate fraud in order to conclude that the defendant should be held liable for civil conspiracy. Unable to find a case addressing the jury's concern in the context of a civil-fraud litigation, the district judge ultimately informed the jury that it need not agree on the form of predicate fraud as long as it was unanimous on the "object of the conspiracy." Having received that supplemental instruction, the jury

returned a verdict finding that Davidson had committed the predicate tort of "either (1) a fraudulent misrepresentation . . . OR (2) a fraudulent omission/concealment."

Headwaters now argues that the disjunctive jury verdict demonstrates that the district court's supplemental instruction was sufficiently prejudicial to warrant a remand for a new trial. Specifically, the defendant insists that the jury should have been required to agree unanimously on which predicate tort Davidson committed. However, any error committed by the district court in failing to require the jury to differentiate between fraudulent misrepresentation and fraudulent concealment was harmless. The evidence adduced at trial was sufficient to justify a finding that the true state of Adtech I's existence both was misrepresented to the plaintiffs and was actively concealed from them. Significantly, moreover, the defendant does not challenge in this appeal the sufficiency of the evidence of any of the three forms of fraud alleged by the plaintiffs.

Because the jury's verdict did not refer to promissory fraud, Headwaters's contention that promissory fraud is sufficiently distinct from the other forms of the tort to call into question the legitimacy of the jury verdict makes no difference in this case. The jury did not base its conspiracy finding on the predicate tort of promissory fraud. The defendant thus was not prejudiced by any possible error in the district court's supplemental jury instruction related to that predicate.

**B.      Cross-Appeal by Named and Unnamed Plaintiffs Included in the Constructive Trust (Case 12-5594)**

###    1.   Damages Calculation

Despite receiving jury verdicts in their favor, the named plaintiffs and the unnamed plaintiffs who shared in the constructive-trust remedy cross-appealed to this court, complaining that their monetary recovery was not as substantial as it should have been.   In their first appellate issue, the plaintiffs contend that the jury's damages verdict should be overturned because the finders of fact erroneously included in their calculations shares of Adtech stock that were controlled by Davidson and by Davidson's wife.   In so arguing, the plaintiffs face an uphill climb. As we have held consistently, "review of a jury's damage award is extremely deferential."   *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 413 (6th Cir. 2006).   "[U]nless the award 'is contrary to all reason,'" we will not disturb the jury's determination.   *Id.* (quoting *In re Lewis*, 845 F.2d 624, 635 (6th Cir. 1988)).

Without question, the jury's damage award to the plaintiffs was significantly lower than the amount requested.   Indeed, the plaintiffs sought from the defendants a total of $43,986,389 – an amount equal to all royalties received by Headwaters from the Carbontec license – but were awarded "only" $16,011,771, or the equivalent of $43.98 a share.   The plaintiffs insist that the jury's $43.98-per-share award must have resulted from the jury accepting the $43,986,389 royalty figure and dividing it by the one million shares of stock issued by Adtech.   If such a calculation was the basis for the jury's damage award, the plaintiffs claim, that award should be recalculated because only 467,743 Adtech shares were distributed to the plaintiffs; the remaining 532,257

18

shares were owned by Davidson's wife, Marilyn Davidson, and by Macrotech, a company controlled by Davidson himself. According to the plaintiffs, if the jury intended to distribute $43,986,389 in damages, that distribution should have been spread over only the 467,743 shares owned by the plaintiffs, yielding an award of $94.04 per share, more than twice the award approved by the district court.

Nothing in the record before us on appeal compels the conclusion that a reasonable juror could not have arrived at the chosen damage-award amount without considering the challenged shares owned by Macrotech and Marilyn Davidson. Even if we were to accept the plaintiffs' argument that the Macrotech and Marilyn Davidson shares were invalid, we still would not be justified in second-guessing the jury's reasoning process without some concrete, non-speculative evidence that the jury factored the allegedly invalid shares into its consideration. As the district court observed, the jury may well have reduced the damages award in the belief that Headwaters significantly contributed to the success of the Carbontec license, or for some other legitimate reason.

Furthermore, the record does not indicate that Davidson's transfer of certain shares to Macrotech and to his wife without board approval was necessarily invalid. In fact, as even the plaintiffs acknowledge, the validity of the transfer of those shares was never challenged either by the plaintiffs or by other board members until the commencement of this case. Because nothing in the record compels the conclusion that the jury relied on evidence to which no reasonable

fact-finder would give credence, the district court did not err in denying the plaintiffs' post-trial motion challenging the damage award.

### 2. Calculation of Constructive-Trust Amount

At the conclusion of the second of the two jury trials, the district court conducted a hearing on the remaining equitable issue: the plaintiffs' request for creation of a constructive trust over the proceeds realized from the licensing agreement with Carbontec. Over the objections of Headwaters, the district court granted the plaintiffs' request and awarded a constructive trust in the amount of $16,011,771, an amount equal to the total of the 2009 and 2010 jury awards. The plaintiffs now argue that it was inappropriate for the district judge to adopt the lower jury-award amount, rather than the plaintiffs' $43,986,389 requested figure, for four reasons: (1) the district court, sitting in equity, should not have applied the same measure of damages as did the jury, which was considering a legal remedy; (2) in adopting the jury's damage-award amount, the district court improperly concluded that the jury based its award on the fact that Headwaters made significant contributions to the technology; (3) a constructive trust award should be reduced only when the value added by a defendant "dwarfs the value of the original ideas," a situation that is not present here; and (4) the jury verdicts in favor of the plaintiffs were artificially low because, as argued previously, the jurors inappropriately considered the Macrotech and Marilyn Davidson shares in their damages calculation.

We review equitable remedies, including the imposition of a constructive trust, for an abuse of discretion. *See, e.g., Barrett v. Sec'y of Health & Human Servs.,* 840 F.2d 1259, 1263

(6th Cir. 1987). "An abuse of discretion occurs when (1) the district court's decision is based on an erroneous conclusion of law, (2) the district court's findings are clearly erroneous, or (3) the district court's decision is clearly unreasonable, arbitrary or fanciful." *Beil v. Lakewood Eng'g & Mfg. Co.,* 15 F.3d 546, 551 (6th Cir. 1994) (citation omitted). We find no such abuse of the district court's discretion in this matter.

First, in Tennessee, "[a] court of equity in decreeing a constructive trust is bound by no unyielding formula." *Holt v. Holt*, 995 S.W.2d 68, 71 (Tenn. 1999) (quoting *Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 380-81 (N.Y. 1919)). The district court clearly did not abuse its broad discretion in adopting the damage-award figures supplied by the juries.

Second, the district court specifically referred in its ruling to the testimony provided by a number of Headwaters employees that the defendant company indeed did make significant contributions to the success of the '629 Patent. In light of that factual finding, the district court did not abuse its discretion in concluding that it would be inappropriate to order Headwaters to return all income it received as a result of the patent.

Third, the plaintiffs' argument that such a reduction in an award is justified only when the defendant's contributions "dwarf" the value of the original product is misplaced. The plaintiffs' position on this issue relies upon language taken from the Ninth Circuit's opinion in *Mattel, Inc. v. MGA Entertainment, Inc.*, 616 F.3d 904 (9th Cir. 2010). But an opinion from another circuit, although persuasive, is not binding on this court. Moreover, *Mattel* does not announce the broad principle the plaintiffs would have us apply here. In *Mattel*, the Ninth Circuit recognized only

that the defendant in that case *did* prove that its efforts 'dwarfed the value' of the original product, not that the company was *required* to prove such disproportionate contributions in order to justify a downward adjustment of an award sought by the plaintiff. Thus, nothing in the language of Mattel suggests that the district court's decision in this matter constituted an abuse of its discretion.

Finally, for the same reasons stated previously in this opinion, the plaintiffs' argument that the juries erred in allegedly considering the Adtech shares owned by Macrotech and by Marilyn Davidson in arriving at its suggested damage figure is without merit. The plaintiffs offer no new analysis or evidence on this issue to warrant our reaching a decision that the district court abused its discretion in ordering its equitable remedy.

### 3. Denial of Prejudgment-Interest Award

Finally, the plaintiffs argue that the district court erred in denying their motion for an award of prejudgment interest in addition to the district court's constructive-trust award. "We review the District Court's decision to award prejudgment interest for abuse of discretion." *EEOC v. Ky. State Police Dep't*, 80 F.3d 1086, 1097 (6th Cir. 1996) (citation omitted). When "state law claims come before a federal court[,] . . . the award of prejudgment interest rests on state law." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 333 (6th Cir. 2007) (internal quotation marks and citation omitted).

Under Tennessee law, "[a]n award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927

(Tenn. 1998) (citations omitted). In deciding whether to award prejudgment interest, the trial court should be guided by three principles. First, "the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Id.* (citations omitted). Second, "prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds." *Id.* (citation omitted). Third, "interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds." Id. (citation omitted). Guided by these equitable principles, prejudgment interest "may be awarded by courts or juries . . . at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." Tenn. Code Ann. § 47-14-123.

Ultimately, the district court denied the plaintiffs' request for prejudgment interest, noting "[t]he length of this case"; the dismissal of "certain unnamed Plaintiffs' claims as late as August 2010"; the jury determination that "certain unnamed Plaintiffs' reliance on Davidson was not reasonable"; and the contested nature of the "Plaintiffs' entitlement to [the royalty] payments." Thus, although the district court agreed with the juries' damages awards, the actual quantity of the constructive trust was not determined until the district court issued its ruling on April 11, 2011. Such uncertainty alone does not require that the district court forgo awarding prejudgment interest; however, nothing in Tennessee case law forbids consideration of the uncertainty of an award when making a determination concerning the propriety of awarding prejudgment interest. Indeed, throughout this appeal, the plaintiffs have continued to dispute the percentage of the Carbontec

royalties owed to them. That disagreement, in addition to other disputes between the parties, strongly suggests that the district court did not abuse its discretion in denying the plaintiffs' request for prejudgment interest. We find no error in this regard.

**C.     Cross-Appeal by Unnamed Plaintiffs Not Included in the Constructive Trust (Case 12-5595)**

**1.   Failure to Certify Class Pursuant to Fed. R. Civ. P. 23.2**

The unnamed plaintiffs who did not receive a portion of the constructive-trust proceeds also raise objections to a number of rulings made by the district court during the course of this litigation. They first assert that the district court erred in denying them class certification under Rule 23.2 of the Federal Rules of Civil Procedure because, even though the Illinois Secretary of State had dissolved Adtech I, Davidson continued to operate the enterprise as an ongoing business, and the unnamed plaintiffs thus were entitled to pursue recovery of damages they believed were owed to them.

> The pertinent language of Rule 23.2 provides:
>
> This rule applies to an action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties. The action may be maintained only if it appears that those parties will fairly and adequately protect the interests of the association and its members.

In denying Rule 23.2 certification, the district court concluded that the unnamed plaintiffs could not be considered an unincorporated association because they failed to demonstrate "voluntary and knowing membership" in the business. It is this ruling that the unnamed plaintiffs dispute. Regardless of the correctness of the district court's reasoning on the "voluntary and knowing

24

membership" requirement, the unnamed plaintiffs failed to contest a second prong of the district court's determination – that the named plaintiffs could not represent adequately the interests of "those Adtech shareholders who participated in and profited from the business affairs of the second Adtech." Because a prerequisite to Rule 23.2 certification is the demonstration of fair and adequate representation of the interests of the association's members, the district court's conclusion that the named plaintiffs could not provide adequate representation for the unnamed plaintiffs justified the denial of the class certification.

### 2. Dismissal of Certain Unnamed Plaintiffs Prior to the 2010 Trial

In light of the class-certification denial, the unnamed plaintiffs were faced with the prospect of demonstrating, on an individual basis, their entitlement to relief. Prior to the commencement of the 2010 trial, however, the district court granted partial summary judgment in favor of Headwaters, dismissing the fraud claims of two categories of proposed class members: (1) individuals who were heirs of deceased shareholders and (2) shareholders who had declared bankruptcy. Those unnamed plaintiffs now challenge the validity of that the grant of partial summary judgment, which we review *de novo*. *Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013).

One necessary element of the Tennessee torts of fraudulent misrepresentation and fraudulent omission/concealment is the plaintiff's reasonable reliance on the defendant's misrepresentation. *See Power & Tel. Supply Co.,* 447 F.3d at 931 (quoting *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)). "The burden is not upon the defendant . . . [but]

25

upon the plaintiff to show" such reasonable reliance. *McNeil v. Nofal*, 185 S.W.3d 402, 408-09 (Tenn. Ct. App. 2005) (quoting *Williams v. Berube & Assocs.*, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)). In this case, however, the district court found not only that the deceased shareholders themselves failed to offer sworn testimony before their deaths concerning their knowledge of Davidson's activities and "how they relied on any statements and/or omissions," but also that the shareholders' heirs did "not know what their decedents knew with regard to Davidson's misrepresentations and/or omissions." In short, the heirs of the deceased shareholders of Adtech produced no "specific evidence that could demonstrate what the decedents knew and relied upon." Without evidence of a basis for reasonable reliance on Davidson's representations, the heirs of the deceased shareholders, as a matter of law, could not establish an essential element of their fraud claims. *See Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343, 353 (6th Cir. 2000).[3] The district court thus did not err in granting partial summary judgment to Headwaters in this regard and in concluding that the unnamed plaintiffs should not be included in the constructive-trust judgment.

Likewise, the district court did not err in dismissing the claims of six unnamed plaintiffs who had filed for bankruptcy. Upon the bankruptcy filings, any claims previously held by the six plaintiffs vested "in the trustee for the benefit of the bankruptcy estate." *See Bauer v. Commerce*

---

[3]The plaintiffs assert that *Glassner* did not hold that fraud plaintiffs must offer testimony as to their reasonable reliance on a defendant's concealment or misrepresentation. The plaintiffs claim, instead, that *Glassner* merely stands for the proposition that specific evidence of reasonable reliance is necessary to defeat a defendant's argument that the risks associated with the defendant's action are "common knowledge." It is true that *Glassner* involved a plaintiff's efforts to overcome the fact that the risks of smoking were common knowledge. However, that case did not otherwise undermine the necessity of alleging in a common-law fraud claim that the plaintiff "relied on [the defendant's] alleged misrepresentations." *Glassner*, 223 F.3d at 353.

*Union Bank, Clarksville, Tenn.*, 859 F.2d 438, 441 (6th Cir. 1988) (citation omitted).   The estates of the bankrupt shareholders did not bring claims against Headwaters, however.   Thus, the causes of action put forth by the individual debtors were properly dismissed.

### 3.   Claims by Unnamed Plaintiff Class Members Denied Recovery

In a final allegation of error, a number of other unnamed plaintiffs argue that the district court erred by not including them in the constructive-trust award after the jury in the 2010 trial found that they also had not established their reasonable reliance upon Davidson's statements.   To the extent that these plaintiffs challenge the correctness of the jury verdict, we note again that we will uphold the jury's determination unless it is "contrary to all reason."   *Mike's Train House*, 472 F.3d at 413.   In assessing the propriety of the district court's remedial ruling creating the constructive trust, we examine the record only for an abuse of discretion.   *See, e.g., Barrett*, 840 F.2d at 1263.

Both the unnamed plaintiffs and Headwaters refer to some testimony that would support their respective positions.   If the record on appeal contains any reasonable evidence supporting the jury's verdict, we must affirm that determination.   Because the unnamed plaintiffs here have failed to present evidence that *compels* a result contrary to that reached by the jury, their challenge to the verdict fails.

The unnamed plaintiffs also ask us to modify the district court's constructive-trust award to include even those unnamed plaintiffs who did not receive jury verdicts in their favor.   The district court had broad discretion to issue the constructive trust as it saw fit in accord with the

equities of the case. The decision to exclude from the constructive trust those claimants who could not establish reasonable reliance upon Davidson's statements obviously is not contrary to the equities of the case. Accordingly, we also affirm the district court's decision to exclude those plaintiffs from the constructive-trust award.

## III. CONCLUSION

For the reasons expressed in this opinion, we find no reversible error in connection with any of the issues advanced on appeal by defendant Headwaters. Similarly, we find no error that would require us to reverse any of the verdicts, findings, or rulings of which the named and unnamed plaintiffs complain. Consequently, we AFFIRM the judgment of the district court.

**McKEAGUE**, Circuit Judge, dissenting.

The majority may accurately assess the merits of the parties' arguments, however, the majority misses one key point: do the plaintiffs have standing? I think not and respectfully dissent from the majority's analysis.

A statute that has been bandied about periodically throughout the litigation but never given much attention is Illinois's corporate survival statute: 805 Ill. Comp. Stat. 5/12.80. It reads as follows:

> The dissolution of a corporation . . . by the issuance of a certificate of dissolution in accordance with Section 12.40 of this Act . . . shall not take away nor impair any civil remedy available to or against such corporation, its directors, or shareholders, for any right or claim existing, or any liability incurred, prior to such dissolution if action or other proceeding thereon is commenced within five years after the date of such dissolution.
>
> The Seventh Circuit has explained the significance of this statute as follows:
> Under the common law a corporation's capacity to sue or be sued terminated when the corporation was legally dissolved. 16A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 8142 (1979 Rev. Vol. Richard P. Eickhoff). Today, however, the harshness of the common law on creditors and shareholders has been replaced in every state by statutes which extend the corporate life for a definite time for the purpose of prosecuting and defending suits. However, where a statute continues the existence of a corporation for a certain period, it is generally held that the corporation becomes defunct upon the expiration of such period, at least in the absence of a provision to the contrary, so that no action can afterwards be brought by or against it and must be dismissed. 16 Fletcher, *supra*, § 8144.

*Canadian Ace Brewing Co. v. Joseph Schlitz Brewing Co.*, 629 F.2d 1183, 1185 (7th Cir. 1980).

The survival statute applies both to suits brought by the corporation or its shareholders and suits brought against them. Since the Plaintiffs in this case filed suit well after the five-year survival period had expired, their claim was extinguished unless it falls within one of two exceptions to the statute. The first exception, which clearly does not apply here, is for actions

brought to enforce a promissory note or other similar corporate asset that passes to shareholders after dissolution as a matter of law. *See Sharif v. Int'l Dev. Grp. Co., Ltd.*, 399 F.3d 857, 861–62 (7th Cir. 2005). The second exception is for actions that can be brought by shareholders directly rather than as derivative claims. *See id.* at 361. Only derivative claims are limited by the five-year survival period. *Id.* To determine whether the Plaintiffs' claim is properly categorized as direct or derivative requires consideration of the Shareholder Standing Rule.

The Shareholder Standing Rule "is a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The rule implicates the nonconstitutional prudential component of standing rather than the Article III case-or-controversy component. *See id.* at 335–36. It ensures that the plaintiff is "assert[ing] his own legal rights and interests" and is not "rest[ing] his claim to relief on the legal rights or interests of third parties." *Id.* at 336 (quotation omitted). The use of the word "standing" has been considered a "misnomer" in this context because the rule is concerned not with "standing (in the sense that the complaint does not allege a 'case or controversy' justiciable under Article III) but the identity of the real party in interest." *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 159 (7th Cir. 1996); *see also* Fed. R. Civ. P. 17(a) ("An action must be prosecuted in the name of the real party in interest.").

Although shareholders cannot sue in their individual capacities to enforce the corporation's rights, "[t]here is an exception to [the] rule allowing a shareholder with a direct, personal interest

in a cause of action to bring suit even if the corporation's rights are also implicated." *Franchise Tax Bd.*, 493 U.S. at 336. Since Adtech was incorporated in Illinois, Illinois law governs its shareholders' ability to sue. *Frank*, 83 F.3d 159. The court in *Frank* summarized Illinois law as follows:

> Illinois follows the widespread rule that an action for harm to the corporation must be brought in the corporate name. When investors have been injured in common, they must continue to act through their collective—the corporation . . . . Injury to the corporation does not, however, prevent suit by an investor who suffers a distinct personal injury—for example, a shareholder who alleges that members of the board have refused to return stock pledged to secure a debt, even after the loan has been paid; or a shareholder-employee who contests his discharge from employment . . . . The American Law Institute's *Principles of Corporate Governance: Analysis and Recommendations* § 7.01 (1992), captures this nicely: "An action in which the holder [i.e. the investor] can prevail only by showing an injury or breach of duty to the corporation should be treated as a derivative action. . . . An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action that may be maintained by the holder in an individual capacity.

*Id.* at 160. Illinois courts say that to determine whether an action is derivative, the court must "determine if the 'gravamen' of the pleadings states injury to the plaintiff upon an individual claim as distinguished from an injury which indirectly affects the shareholders or affects them as a whole." *Zokoych v. Spalding*, 334 N.E.2d 805, 813 (Ill. App. 1976). The bottom line is that if a plaintiff has been injured directly he can bring a direct action to rectify that harm; but if he has been injured indirectly as a shareholder he must bring a derivative action.

So how were the Plaintiffs harmed here, directly or indirectly? Before determining *how* they were injured it is important to nail down exactly *when* they were injured. The Plaintiffs were not injured when the assignment of the patent failed. Rather, they were injured when Adtech was dissolved. After the dissolution occurred, their injury was complete, and the Plaintiffs suffered

no further injury from the subsequent unsuccessful assignment. The only entity that could possibly have been harmed by the unsuccessful assignment was the corporation because it was the only entity that was ever supposed to receive the patent in the first place. The unsuccessful assignment of the patent really carries very little significance in this case. Rather, the dissolution is the important event.

The reason it appears at first glance that the unsuccessful assignment injured the plaintiffs results from the magnitude of the transaction. Imagine that instead of purporting to assign a patent worth millions, Davidson had instead signed a rental agreement to lease some office space in the corporation's headquarters for his personal use. If Davidson later disclosed that the rental agreement was invalid and tried to back out, would the Plaintiffs now maintain that they were injured when the rental agreement was signed? Almost certainly not. Everyone would recognize that their injury occurred when the corporation dissolved.

Just so under these facts. The factual magnitude of the transaction should not be allowed to obscure the legal realities of the situation.

After determining that the Plaintiffs were injured when the corporation was dissolved, it is then possible to figure out how they were injured—directly or indirectly?[41] Clearly indirectly.

---

[1]This analysis is inconsistent with a case from the Illinois Court of Appeals. See *Hamilton v. Conley*, 827 N.E.2d 949, 952–53 (Ill. Ct. App. 2005). In *Hamilton*, after a corporation was dissolved its sole officer and director dealt away the corporation's assets to two companies he controlled. 827 N.E.2d 949, 952–53 (Ill. Ct. App. 2005). Six years after dissolution, a former shareholder sued the director and his two companies. *Id.* at 953. The court concluded that the shareholder's cause of action was derivative, but it also concluded that the cause of action was a corporate asset which devolved to the shareholders by operation of law after the five–year survival period expired. *Id.* at 957–58. After determining that the shareholder had the right to bring the

The corporation suffered a direct injury because it ceased to exist; the Plaintiffs were harmed indirectly because at that point they held shares in a company that was no longer a going concern and, not surprisingly, shares in a dissolved company are worth less than shares in an undissolved one. *See Cashman v. Coopers and Lybrand*, 623 N.E.2d 907, 911 (Ill. Ct. App. 1993).

Because the Plaintiffs were harmed only indirectly, their claim must be categorized as derivative. As a derivative claim, it is covered by the survival statute and, not having been brought within the requisite five years, was extinguished and should have been dismissed. This case, in which the litigation began nine years after dissolution and is still dragging on over twenty years after dissolution, aptly illustrates one of the reasons for the five-year limit in the survival statute, which is to establish "'a definite point in time at which the existence of a corporation and

---

claim in his individual capacity, the court next analyzed whether that claim was untimely under the survival statute. *Id.* at 959. It determined that "equitable considerations" "counsel[ed] against rote application of the Survival Statute" because the director "waited until shortly before the close of the five-year winding-up period to engage in misconduct with respect to corporate assets." *Id.* at 960.

    *Hamilton*, however, is a poorly reasoned case and I decline to follow it. First, by essentially concluding that all inchoate causes of action devolve to shareholders after dissolution, *Hamilton* ignored the careful distinction noted by the Seventh Circuit between claims "based on 'a debt of which the fixed amount could be ascertained'" (e.g. a promissory note) and a "traditional breach of contract claim." *Sharif*, 399 F.3d at 861–62 (quoting *Shute v. Chambers*, 492 N.E.2d 528 (Ill. Ct. App. 1986)). The former type of claim devolves to shareholders as a corporate asset as a matter of law and can be brought after the survival period expires. The latter type of claim does not devolve to shareholders and is subject to the survival period. Ignoring this distinction, as the court did in *Hamilton*, "would effectively nullify the Illinois corporate survival statute," *id.* at 862, since it would mean that all causes of action pass to shareholders after a corporation dissolves.

    Furthermore, after concluding that the cause of action could be brought directly by a shareholder, the *Hamilton* court then proceeded to apply the survival statute. *Hamilton*, 827 N.E.2d at 959. But as the Seventh Circuit pointed out, the survival statute does not apply to direct claims brought by shareholders. *Sharif*, 399 F.3d at 861. After determining that the shareholder could sue directly, the *Hamilton* court should not have proceeded to analyze whether the claim was timely under the survival statute. Accordingly, I decline to follow *Hamilton*.

the transaction of its business are terminated. To allow . . . the continued prosecution of lawsuits perverts the definiteness and orderly process of dissolution so as to produce a continuous dribble of business activity contrary to the intent of the winding up provisions of the statute.'"" *Canadian Ace Brewing*, 629 F.2d at 1190 (quoting *Bishop v. Schield Bantam Co.*, 293 F. Supp. 94, 96 (N.D. Iowa 1968)). The fact that the dissolution in this case was not known to or intended by the shareholders does not make a definite period for filing suit any less important. Other companies need to know when they can safely acquire assets that were owned at one time by a corporation that dissolved, without worrying about the threat of a lawsuit brought by former shareholders of the erstwhile corporation.

I respectfully dissent.